**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § § | |
| Plaintiff, | § § | CAUSE NO. 4:17-CR-00121- MAC-CAN |
| v. | § § § | |
| OMERO LUJAN (9), | § § | |
| Defendant. | § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Pending before the Court is Defendant Omero Lujan's Motion to Suppress ("Defendant's Motion to Suppress") [Dkt. 120]. On December 6, 2017, the undersigned conducted an evidentiary hearing and heard oral argument from both the Government and Defendant on the pending Motion to Suppress. After considering the Motion to Suppress, the Government's Response [Dkt. 135], supplemental briefing by the Government [Dkt. 147] and Defendant [Dkts. 148; 149], and all other relevant filings and evidence, as well as the oral argument presented, the Court recommends that Defendant's Motion to Suppress [Dkt. 120] be **DENIED**.

**BACKGROUND**

**I.    THE INDICTMENT**

On July 12, 2017, Defendant was indicted in the Eastern District of Texas on drug related charges [Dkt. 1]. The original indictment was superseded on August 9, 2017 [Dkt. 49]. In the Superseding Indictment, Defendant is charged with Conspiracy to Possess with the Intent to Distribute and Distribution of Marijuana and Cocaine in violation of 21 U.S.C. 846 [*see* Dkt. 49]. The Superseding Indictment alleges that "from sometime in 2009, and continuously thereafter up

to and including the date of this Superseding Indictment, in the Eastern District of Texas and elsewhere, [Defendant], did knowingly and intentionally combine, conspire, and agree with other persons known and unknown to the United States Grand Jury, to knowingly and intentionally possess with the intent to distribute and distribute 1000 kilograms or more of a mixture or substance containing a detectable amount of marijuana and five kilograms or more of a mixture or substance containing a detectable amount of cocaine" [Dkt. 49 at 1-2].

## II. MOTION TO SUPPRESS

Defendant filed the instant Motion to Suppress [Dkt. 120] on October 30, 2017, seeking to suppress "all evidence, both physical and testimonial, obtained or derived from or as a result of the unlawful search, seizure, interrogation, arrest and detention of Defendant which occurred on December 1, 2016, in Midland Texas" [Dkt. 120 at 1]. Therein, Defendant argued that he was unlawfully stopped and detained without a warrant upon leaving his residence. On November 8, 2017, the Government filed its response [Dkt. 135]. On December 6, 2017, the Court conducted an evidentiary hearing, wherein Detective and DEA Task Force Officer Travis Putman ("TFO Putman"), Midland DEA Resident Agent in Charge Eric Castaneda ("RAC Castaneda"), and Defendant's wife Erica Urias, each testified. Defendant admitted two exhibits at Hearing; Defendant's Exhibit 1, is a picture depicting the vehicle Defendant was driving when stopped. Defendant's Exhibit 2, is a Google Map depiction of the route RAC Castaneda and TFO Ryan Stafford ("TFO Stafford") took in following Defendant [Dkt. 150 at 90, 96]. In light of new arguments raised at Hearing, the Court permitted additional briefing and on December 11, 2017 and December 15, 2017, the Parties filed supplemental briefing [Dkts. 147; 148; 149]. The Hearing Transcript was filed on December 28, 2017 [Dkt. 150]. The underlying facts relevant to Defendant's Motion to Suppress are summarized as set forth below.

## III. THE UNDERLYING FACTS

On November 30, 2016, Israel Rey-Carillo ("Carillo"), a co-defendant herein, met with undercover DEA Task Force Officer Pete Castillo ("TFO Castillo") and a confidential source at a Mexican restaurant in the North Texas area to discuss potential drug transactions [Dkt. 150 at 2-13, 36]. During the course of this meeting, Carillo agreed to deliver five hundred (500) pounds of marijuana and one (1) kilogram of cocaine to the confidential source on the next day, December 1, 2016 [Dkt. 150 at 13].

Relevant herein, the confidential source had previously reported to Dallas DEA that a large-scale drug trafficking organization headed by Raul Borunda ("Borunda"), another co-defendant, was trafficking marijuana and cocaine from Mexico into the United States [Dkt. 150 at 8-11]. The confidential source further stated that Borunda was using Carillo, a Midland, Texas resident, as a runner or drug courier for the organization [Dkt. 150 at 8-9]. Carillo was alleged to be transporting drugs in his vehicle from the Midland/Odessa area to the Dallas/Fort Worth area [Dkt. 150 at 9-12]. Generally, Carillo would arrive in the Dallas/Fort Worth area in the morning with the drugs; he would pick up drug proceeds and then return to the Midland/Odessa area [Dkt 150 at 10]. The confidential source further averred that the drugs were being stored in various trailers or warehouses in the Midland/Odessa area [Dkt. 150 at 9].

TFO Putman, who conducted the Dallas DEA efforts, in coordination with Midland DEA, testified that on November 30, 2016, while Carillo met with TFO Castillo and the confidential source, he placed a tracking device on Carillo's vehicle [Dkt. 150 at 14]. The order permitting installation of the tracker was issued on November 28, 2016 by Dallas County District Judge Pat McDowell [Dkt. 150 at 14-15, 25]. GPS data from November 30, 2016 reflected that Carillo's vehicle traveled after the meeting from Dallas/Fort Worth to Midland, Texas [Dkt. 150 at 14-15].

On December 1, 2016, GPS data showed Carillo left his residence in Midland/Odessa, Texas at approximately 5:00 a.m. [Dkt. 150 at 15]. Carillo next visited a residence, located at 9918 South County Road 1136 in Midland County, Texas, which was later identified as Defendant Lujan's residence ("Lujan's Residence" or the "property") [Dkt. 150 at 15, 18]. Carillo remained at that address for approximately 20 minutes before proceeding to Interstate 20 (or I-20) and heading eastbound towards Dallas/Fort Worth [Dkt. 150 at 15]. Carillo made no other stops prior to traveling towards Dallas/Fort Worth; accordingly, TFO Putman believed Carillo had picked up the marijuana he intended to deliver to the confidential source at Defendant Lujan's residence [Dkt. 150 at 16-17].

Law enforcement was able to obtain a satellite photo of 9918 South County Road 1136 in Midland County, Texas, and then using a toll analysis of Borunda's cellphone to connect and/or link Defendant Omera Lujan with Borunda and the property [Dkt. 150 at 17-18]. More specifically, testimony was presented that Defendant had sent a wire transfer; and in sending the wire Defendant had provided both identification and his telephone number. The telephone number Defendant provided for purposes of making the wire transfer was also a number in Borunda's phone tolls [Dkt. 150 at 17-19]. TFO Putnam testified this information enabled law enforcement to obtain a copy of Defendant's "actual ID" and to link or connect him to Borunda [Dkt. 150 at 18]. TFO Putnam further testified that the satellite images of the property showed what he described as an "excellent" location for storing narcotics [Dkt. 150 at 17].

TFO Putman informed TFO Mitch Russell, of the Midland DEA of Carillo's whereabouts and his belief that Carillo was carrying a load of marijuana believed to have originated from Defendant Lujan's residence [Dkt. 150 at 23-24]. TFO Putman also provided TFO Russell with a copy of the satellite image and Defendant Lujan's "actual ID" with his photo and associated

address [Dkt. 150 at 18, 23-24] and requested surveillance of the property be conducted. TFO Russell arranged for surveillance to be conducted of Lujan's residence [Dkt. 150 at 18-19, 24].

On December 1, 2016, at approximately 8:30 to 9:00 a.m., RAC Castaneda and TFO Stafford, acting on information provided from Dallas DEA, went to Defendant's address to surveil it [Dkt. 150 at 72, 76-77]. Surveillance of the property began several hours after Carillo had departed. RAC Castaneda testified, from prior experience, that the rural and remote property, large storage shed, and Sports Utility Vehicle ("SUV") on the property reminded him of drug stash houses he had encountered while working as DEA agent in South Texas [Dkt. 150 at 72-73].

Approximately two hours after surveillance of Lujan's residence began (at around 10:05 a.m.), Dallas DEA stopped Carillo outside of Fort Worth [Dkt. 150 at 48]. At or around 10:54 a.m., Carillo signed a written consent form allowing Dallas DEA to search his vehicle [Dkt. 150 at 57-58]; the officers thereafter located approximately five hundred (500) pounds of marijuana in Carillo's truck. During the stop and prior to the discovery of marijuana, Carillo made a series of phone calls to other persons associated with the narcotic trafficking organization, including the confidential source to whom Carillo was supposed to be delivering the drugs and Borunda [Dkt. 150 at 19-20]. Dallas DEA informed Midland DEA of each of these developments [Dkt. 150 at 57-58, 60].

At approximately 11:00 a.m. [Dkt. 150 at 115], RAC Castaneda and TFO Stafford observed the SUV departing the Lujan residence [Dkt. 150 at 74-75]. They did not observe Defendant enter the vehicle and RAC Castaneda testified that prior to stopping the vehicle he was not certain of the persons in the vehicle [Dkt. 150 at 101-102]. RAC Castaneda and TFO Stafford followed Defendant's vehicle for approximately 12 miles, as the vehicle headed towards I-20 [Dkt. 150 at 74-75]. At approximately 11:20 a.m., RAC Castaneda and TFO Stafford were alerted

that DEA had recovered hundreds of pounds of marijuana from Carillo's vehicle [Dkt. 150 at 87, 95-97, 115]. Acting on this information, RAC Castaneda and TFO Stafford stopped Defendant's vehicle [Dkt. 150 at 95-97].[1]

Upon making the stop, RAC Castaneda asked Defendant to exit the vehicle [Dkt. 150 at 100]. Communicating to Defendant in Spanish, RAC Castaneda informed Defendant of the reason for the stop and his belief that Defendant had a large amount of marijuana either in his vehicle or stored at his residence [Dkt. 150 at 75]. RAC Castaneda asked for permission to search both Defendant's vehicle and his residence [Dkt. 150 at 75]. Defendant verbally consented to a search of his vehicle and residence [Dkt. 150 at 76]. The search of the vehicle revealed no marijuana [Dkt. 150 at 100-103]. After determining no drugs were present in the vehicle, RAC Castaneda and TFO Stafford allowed the other occupants of the vehicle, Defendant's wife and young child to depart in Defendant's vehicle [Dkt. 150 at 103]. Defendant confessed to RAC Castaneda and TFO Stafford that a large amount of marijuana was stored at his residence [Dkt. 150 at 112].

Notably, the witnesses estimated that no more than five minutes to ten minutes elapsed between the execution of the stop and Defendant's confession that drugs were present at his residence [Dkt. 150 at 116]. RAC Castaneda estimated that less than five minutes passed from the time Defendant was stopped until Defendant confessed that he had narcotics on his property [Dkt. 150 at 116]. Defendant's wife also testified at Hearing concerning the stop, her testimony

---

[1] To the extent that testimony at hearing reflected discrepancies concerning the exact time of the events described, it is significant that neither party disputed that RAC Castaneda and TFO Stafford initiated the stop of Defendant's vehicle only after being alerted by DEA that Carillo's vehicle contained marijuana.

largely corroborated the testimony given by RAC Castaneda, including the length of the stop. Defendant's wife stated that the stop took approximately seven to ten minutes [Dkt. 150 at 126].[2]

Following the stop of Defendant's vehicle, RAC Castaneda and TFO Stafford returned with Defendant to his residence and conducted a search; marijuana was discovered in the storage structure on the property [Dkt. 150 at 113]. The shed contained approximately seven to eight hundreds of pounds of marijuana, packaged in square bales, and also amounts of cocaine [Dkt. 120 at 3]. After discovering the marijuana and cocaine, Defendant was taken to the Midland DEA office, read his Miranda rights, and spoke further with DEA [Dkt. 150 at 114-115]. RAC Castaneda testified that Defendant was cooperative throughout the proceedings [Dkt. 150 at 113].

## ANALYSIS

Defendant argues that all evidence, physical and testimonial, should be suppressed because all evidence was obtained and/or derived from law enforcement's illegal search and seizure of Defendant on December 1, 2016 in Midland, Texas [Dkt. 120 at 3]. More specifically, Defendant asserts he was seized within the meaning of the Fourth Amendment when law enforcement stopped, and detained him without a warrant upon leaving his residence [Dkt. 120 at 3-4]. Defendant alleges Midland DEA was acting on a blanket order to detain anyone who left the property (and thus no reasonable suspicion or probable cause existed to conduct the stop), and that such a warrantless seizure was in violation of his Fourth Amendment rights. Defendant argues a warrant should have been procured, and no exigent circumstances existed to justify not obtaining such warrant. Furthermore, Defendant argues that his confession and all evidence seized from his property (obtained after the stop of his vehicle) constitutes fruit of the poisonous tree

---

[2] Defendant's wife and RAC Castaneda differed in their estimations of the number of officers present at the scene of the stop but otherwise generally corroborated each other's testimony, particularly related to the length of the stop. [Dkt. 150 at 108-109, 123, 124].

[Dkt. 120 at 4].  The Government argues, in response, that the investigate stop initiated on Defendant's vehicle was a proper *Terry* stop and was justified under the collective knowledge doctrine [Dkt. 135 at 3-4].  The Government also argues in the alternative that no Fourth Amendment violation occurred because the marijuana and cocaine would have been discovered independently [Dkt. 135 at 4] and/or because exigent circumstances present in the case justified the search [Dkt. 146]

As an initial matter, the Fourth Amendment ensures that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  The warrantless search of an area in which the Defendant has a privacy interest is per se unreasonable, unless the Government can show that an exception applies. *Katz v. United States,* 389 U.S. 347, 357 (1967).  In the instant case, at Hearing, both the Government and Defendant agreed the Government bore the burden of proof on Defendant's Motion to Suppress [Dkt. 150 at 5].  *See also United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993); *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977), *cert denied* 431 U.S. 932 (1977) (government bears the burden where investigatory stop without a warrant made).

**Terry *Stop Framework***

Traffic stops are considered seizures within the meaning of the Fourth Amendment. *U.S. v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003); *see Delaware v. Prouse*, 440 U.S. 648 (1979). The legality of a traffic stop is analyzed under the framework articulated in *Terry v. Ohio*, 392 U.S. 1, (1968) and its progeny.  *See Knowles v. Iowa*, 525 U.S. 113, 117 (1998); *U.S. v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc).  To determine whether a seizure (i.e.-the stopping of a vehicle and detention of its occupants) is reasonable, the Court must conduct a two part inquiry:

the Court must examine (1) "whether the officer's action was justified at its inception," and then (2) "whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *U.S. v. Brigham*, 382 F.3d 500, 506 (quoting *Terry* at 19–20).

### 1. *First Prong of the* **Terry** *Test: The Search and Seizure of Defendant was Justified at Its Inception*

The Fifth Circuit, in applying the first prong of *Terry* to traffic stops, has found that for a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle. *U.S. v. Banuelos–Romero*, 597 F.3d 763, 766 (5th Cir. 2010); *see, e.g., U.S. v. Santiago*, 310 F.3d 336, 340 (5th Cir. 2002) (a reasonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the initial stop). In other words, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity "may be afoot." *U.S. v. Arvivu*, 534 U.S. 266, 273 (2002) (quoting *Terry* at 30). The likelihood of criminal activity need not rise to the level required for probable when reviewing courts make objective reasonableness determinations, however, they must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. *Id*. (quoting *U.S. v. Cortez*, 449 U.S. 411, 417–418 (1981)). While the standard is objective, the totality of the circumstances standard allows officers to draw on their own experience and specialized training to make inferences from and deductions about cumulative information available to them that might "well elude an untrained person." *Id*. (quoting *Cortez* at 418).

*Collective Knowledge Doctrine*

Reasonable suspicion to stop a vehicle, or probable cause to conduct a search, may arise through the collective knowledge of the officers involved in the operation. *See United States v. Powell*, 732 F.3d 361, 369 (5th Cir. 2013); *United States v. Clark*, 559 F.2d 420, 424 (5th Cir. 1977); *see generally United States v. Hartfield*, 4:14-CR-178, 2015 WL 3622730, at *4–5 (E.D. Tex. June 10, 2015) (explicating interplay of *Terry* standard and collective knowledge doctrine). Under the collective knowledge doctrine, an officer initiating the stop or conducting the search need not have personal knowledge of the evidence that gave rise to the reasonable suspicion or probable cause, so long as he is acting at the request of those who have the necessary information. *See United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999).

*Ibarra-Sanchez* provides useful guidance on the application of the collective knowledge doctrine. 199 F.3d 753 (5th Cir. 1999). In *Ibarra-Sanchez*, a suspected drug stash house was surveilled over an extended period of time. Surveilling officers observed numerous vehicles including a beige van, coming and going from the home and suspected the vehicles were being used to transport drugs. Surveilling agents requested a bulletin be put out to local police for the van to be stopped. *Id*. The bulletin that was issued directed the van to be stopped because it was possibly transporting drugs; dispatch did not inform the officers to form their own reasonable suspicion before stopping the van. The Court found that the officers had reasonable suspicion to believe criminal activity was afoot. Explaining its rationale in finding the stop justified, the Fifth Circuit held that:

> Any analysis of reasonable suspicion is necessarily fact-specific, and factors which by themselves appear innocent, may in the aggregate give rise to the level of reasonable suspicion…
>
> We note that, notwithstanding the appellants' argument to the contrary, the fact that Mattas had not previously obtained a search or arrest warrant is not fatal to the

> propriety of the stop. . . . . Mattas and the agents had reasonable suspicion to stop the van when it pulled away from the Rainbow Ridge residence; the absence of an earlier search or arrest warrant in no way renders that stop illegal.
>
> The actual stop of the van by the EPPD officers was lawful because under what is sometimes referred to as the "collective knowledge" doctrine, the officers shared Mattas's reasonable suspicion. The officers stopped the van in reliance on the dispatcher bulletin, and therefore were not required to have personal knowledge of the evidence that created Mattas's reasonable suspicion. The "collective knowledge" doctrine therefore preserves the propriety of the stop.

*Id.* at 759–60 (internal citations omitted). The collective knowledge doctrine therefore applies so long as there is "some degree of communication" between the acting officer and the officer who has knowledge of the necessary facts. *United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007).

### *RAC Castaneda and TFO Stafford Had Sufficient Reasonable Suspicion to Justify Stop of Defendant.*

The Government argues that Midland DEA appropriately conducted an investigative stop of Defendant based on the collective knowledge shared between Midland DEA and Dallas DEA [Dkt. 135 at 8-10]. Defendant argues that no reasonable suspicion existed and that RAC Castaneda and TFO Stafford were merely following a blanket directive to stop anyone who left the Property; indeed, Defendant points out that RAC Castaneda and TFO Stafford did not see Defendant load any contraband into the vehicle and did not know with any certainty who was in the vehicle when it departed the property [Dkt. 149 at 4]. However, Defendant's argument overlooks the Supreme Court's admonition not to treat each fact in isolation and to instead consider "'the totality of the circumstances and the collective knowledge and experience of the officer.'" *See e.g., United States v. Macias,* 658 F.3d 509, 517 (5th Cir. 2011) (quoting *United States v. Estrada*, 459 F.3d 627, 631–32 (5th Cir. 2006)). Sufficient information was made known prior to the stop justifying the officer's suspicion that criminal activity may be afoot, including but not limited to the following: RAC Castaneda and TFO Stafford were aware that (1) a confidential informant had reported to

Dallas DEA that a drug trafficking organization was storing narcotics in the Midland/Odessa area in warehouses and/or sheds like the one on Defendant's property; (2) a known courier of that organization had visited the property and made no other stops prior to being stopped by law enforcement; (3) that courier had placed phone calls alerting other members in the network after being stopped by law enforcement; and (4) law enforcement located a significant amount of drugs in the courier's car. In addition, both officers were in possession of a photo image of Defendant and had knowledge that Defendant was linked to the supplier of the narcotics distribution network and the property. Moreover, both officers had extensive law enforcement experience, particularly in narcotics, at the time of the stop, per the testimony presented to the Court at Hearing.

The discovery of marijuana in Carillo's vehicle both confirmed the validity of the information provided by the confidential source and gave additional justification for a reasonable suspicion to exist that Defendant's vehicle, which had departed the property, might contain narcotics. At the time of the stop, the totality of the facts (taken together with the officer's experience), demonstrate that RAC Castaneda and TFO Stafford were possessed of the collective knowledge necessary to form a reasonable suspicion that the vehicle might contain narcotics and to be justified in effectuating a *Terry* stop. The fact that RAC Castaneda and TFO Stafford did not observe Defendant loading contraband into the vehicle does not negate their reasonable suspicion that the vehicle (and the property) contained drugs. The initial stop was lawful; considering the totality of these circumstances, RAC Castaneda and TFO Stafford had the reasonable suspicion warranting the stop. *See United States v. Gonzalez-Rodriguez*, 456 F. App'x. 494, 500 (5th Cir. 2012) (troopers stopping defendant had reasonable suspicion that defendant's trailer contained narcotics, based on the surveillance of another trooper, under the collective knowledge doctrine); *Powell*, 732 F.3d 361, 373 (5th Cir. 2013) (acting under the collective knowledge doctrine, officers

were made aware of a tip from a confidential informant that a car possessed narcotics and when the details given by the informant proved accurate the officers initiated a valid *Terry* stop); *United States v. Bustamante*, 478 F. App'x. 922, 925–26 (5th Cir. 2012) (information provided from anonymous tipster proved accurate during investigation of defendant and thus gave officers reasonable suspicion through the collective knowledge doctrine); *see also United States v. McPherson*, 630 F. App'x. 330, 331–32 (5th Cir. 2016) (holding that application of the collective knowledge doctrine requires only "some degree of communication" between the acting officers; it does not require direct communication); *United States v. Carmenate*, 344 F. App'x. 941, 942 (5th Cir. 2009) (officer who received information that drug activity was afoot from another surveilling officer did not violate defendant's Fourth Amendment rights).

2. *Second Prong of the* **Terry** *Test: Defendant was not Unreasonably Detained*

The second prong of *Terry* requires that the Court consider whether the officer's actions were reasonably related to the circumstances that justified the stop. Such a limitation exists because the detention must be temporary and last no longer than is necessary. Here, the testimony of TFO Putnam, RAC Castaneda, and Defendant's wife reveal no impropriety in the events leading up to Defendant's admission that a considerable amount of marijuana was stored on his property. Indeed, as both RAC Castaneda and Defendant's wife attested, Defendant was detained a matter of minutes before revealing the location of the marijuana [Dkt. 150 at 103, 126]. Though there is "no rigid time limitation" delineating the lawfulness of a *Terry* stop, there is no colorable argument here that Defendant was detained for an impermissible time. *Turner v. Lieutenant Driver*, 848 F.3d 678, 693 (5th Cir. 2017) (quoting *United States v. Sharpe*, 470 U.S. 675, 686–87 (1985)).

The clear purpose of the *Terry* stop was to determine whether Defendant had narcotics stored in either his car or on his property. Defendant was informed of this purpose as soon as the

officers made contact with him. It is undisputed that Defendant provided consent to search both the vehicle and the property and admitted that narcotics were stored on his property upon being stopped. *Cf. U.S. v. Shabazz*, 993 F.2d 431, 436 (5th Cir. 1993) (holding that in a typical *Terry* stop, once the suspicion of wrongdoing evaporates, the stop is no longer justified).[3] The Court finds that the detention of Defendant prior to his consent lasted no longer than was necessary to effectuate the stated purpose of the stop and that, considering the totality of the circumstances, the period of pre-consent detention was a reasonable amount of time to detain Defendant. *See United States v. Gomez Diaz*, 4:15-CR-131, 2015 WL 9694519, at *5 (E.D. Tex. Dec. 23, 2015), *report and recommendation adopted*, 4:15-CR-131, 2016 WL 123171 (E.D. Tex. Jan. 11, 2016) ("The Supreme Court has held that Fourth Amendment does not bar an officer from continuing to question a suspect even after all reasonable suspicion has been dispelled so long as the suspect provides consent.").[4]

## CONCLUSION AND RECOMMENDATION

Based on the foregoing, the Court recommends Defendant Omero Lujan's Motion to Suppress Evidence [Dkt. 120] be **DENIED**.

As the Parties agreed at Hearing, within ten (10) days of entry of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendation of the magistrate judge. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed

---

[3] The Court finds based on the record before it that Defendant consented to the search of the vehicle and his residence. The Government asserts and Defendant does not argue that such consent was not provided or that said consent was given freely and voluntarily. *See United States v. Ferguson*, 1:07-CR-70, 2007 WL 4146319, at *7 (E.D. Tex. Nov. 16, 2007) ("To be valid, a consent to search must be free and voluntary.") (citing *United States v. Kelley*, 981 F.2d 1464, 1469 (5th Cir. 1993)).

[4] As the Court finds that the *Terry* stop was justified, the Court does not reach the supplemental arguments put forth by the Government and Defendant, including exigent circumstances [*see* Dkts. 147; 148; 149].

determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1).

**SIGNED this 29th day of December, 2017.**

_____
Christine A. Nowak
UNITED STATES MAGISTRATE JUDGE